## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ABA QUANSAH,** *et al* | **: CIVIL ACTION** |
| | : |
| **v.** | : |
| | **: NO. 17-4334** |
| **JEFFERSON B. SESSIONS, III,** *et al* | : |

**KEARNEY, J.**                                                      **January 12, 2018**

## MEMORANDUM

A Ghana native, Aba Quansah, is married to United States citizen Bernard Anarfi. On his wife's behalf, Mr. Anarfi petitioned for Ms. Quansah to become a United States citizen based on their bona fide marriage. The United States denied Mr. Anafri's petition finding Ms. Quansah is prohibited from becoming a citizen upon finding she earlier entered into a fraudulent marriage for the purpose of evading immigration laws. The United States' denial of Mr. Anarfi's petition means Ms. Quansah is not authorized to remain in the United States and the United States may begin removal proceedings against her. After scrutinizing the record on cross-motions for summary judgment and applying the standard of review from an Order of the Board of Immigration Appeals, we grant the United States' motion for summary judgment affirming the findings and reasoning of the Board of Immigration Appeals.

**I.      Facts**

### A.      Aba Quansah first married Eric Toomer.

A native and citizen of Ghana, Ms. Quansah came to the United States to attend Northern Kentucky University.[1] The United States allowed Ms. Quansah to remain here on a student visa until she completed her university studies at Northern Kentucky University.[2] In March 2005,

Ms. Quansah traveled to Virginia for spring break and met Eric Toomer at a party.[3] They exchanged numbers and three months after Ms. Quansah returned to Kentucky in June 2005, Mr. Toomer called her to wish her a happy birthday.[4] Ms. Quansah and Mr. Toomer began a long distance romantic relationship mainly communicating by phone with a two in-person visits.[5]

On Valentine's Day 2006, Mr. Toomer sent Ms. Quansah flowers and called her on the telephone to ask her if she would marry him.[6] Ms. Quansah said yes.[7]

After inducing Ms. Quansah to marry him, on March 21, 2006, Mr. Toomer married Medrine Wanjiru Ndungu, a Kenyan citizen, in Arlington, Virginia.[8]

Unaware, Ms. Quansah traveled to Arlington, Virginia and on March 23, 2006, she married Mr. Toomer in front of one witness, a friend of Mr. Toomer, Robert Oppong.[9] Mr. Toomer had to work so the newly married couple left the ceremony separately and Mr. Oppong drove Ms. Quansah to Mr. Toomer's home.[10] Ms. Quansah remained there a week before returning to Kentucky.[11]

On July 2, 2006, Mr. Toomer filed a Form I-130 to sponsor Ms. Quansah, as his wife, to become a United States citizen.[12] Mr. Toomer did not disclose his March 21, 2006 marriage to Ms. Ndungu or submit any record of a divorce.[13] During their twenty month relationship, Ms. Quansah never lived with Mr. Toomer; she lived in Kentucky as a student and he lived in Virginia. Ms. Quansah states she was happy in her long distance marriage until August 2006 when Mr. Toomer began to call her less and despite Mr. Toomer's reassurances, the marriage deteriorated and Mr. Toomer only contacted Ms. Quansah for money.[14] In November 2006, Mr. Toomer stopped responding to Ms. Quansah's attempts to communicate and disconnected his number.[15]

2

On May 17, 2012, the State of New York granted Ms. Quansah's petition for divorce from Mr. Toomer.[16]

## B. Aba Quansah's first attempt to become a U.S. citizen.

After her marriage to Mr. Toomer deteriorated, Ms. Quansah continued her studies and graduated from Northern Kentucky University on August, 1 2009. Upon graduating, Ms. Quansah's student visa expired and Ms. Quansah unlawfully remained in the country and worked without authorization in the United States.[17]

The United States' Citizen and Immigration Services ("Immigration Services") requested Ms. Quansah and Mr. Toomer appear for an interview on June 18, 2012 relating Mr. Toomer's Form 1-130 application.[18] Neither Ms. Quansah nor Mr. Toomer appeared at Immigration Services' interview.[19] Immigration Services denied their petition and referred it to the Office of Fraud Detection and National Security.

At the same time, Immigration and Customs Enforcement ("ICE") investigated a "large-scale marriage fraud ring involving Ghanaian nationals married to United States citizens in Arlington, Virginia."[20] The evidence from Ms. Quansah's application matched the indicators of Immigration Services' investigation of the marriage fraud ring including the location of the marriage, location of a where her application was processed, the physician completing her medical certification also named in a marriage fraud investigation and the examination was completed on the day of her marriage.[21] Also Ms. Quansah's Form I-485 contained the language "MARRIED TO A CITIZEN" in Part 2(h).[22] An ICE detective observed Mr. Toomer and Ms. Quansah arriving separately to be married and then separately leaving the courthouse after their wedding, with Ms. Quansah leaving with Mr. Oppong.[23] Mr. Oppong was the only person to

3

attend their wedding.[24] As a result of an ICE investigation, a federal court convicted the only witness to their marriage, Mr. Oppong, of marriage fraud and deported him.[25]

In light of this evidence, Immigration Services found Ms. Quansah and Mr. Toomer entered into a marriage for the sole purpose of circumventing the immigration laws of the United States" and denied Mr. Toomer's petition.[26] On September 12, 2012, Immigration Services started removal proceedings against Ms. Quansah based on her expired F1 student visa.[27]

## C. Ms. Quansah married Bernard Anarfi and he filed a Form I-130 petition on her behalf.

After divorcing Mr. Toomer, Ms. Quansah married Bernard Anarfi, a naturalized United States citizen, on March 15, 2013.[28] On April 26, 2013, Mr. Anarfi submitted a Form I-130 to Immigration Services on behalf of Ms. Quansah to sponsor her for citizenship as his spouse under § 201(b) of the Immigration and Nationality Act.[29] Immigration Services closed the pending removal proceedings against Ms. Quansah based on Mr. Anarfi's Form I-130 petition.[30]

In support of their petition, Ms. Quansah and Mr. Anarfi submitted evidence of joint bank account statements and shared cable and utilities statements.[31] In January 2015, Immigration Services requested Ms. Quansah and Mr. Anarfi appear for interview on his Form I-130 petition and the interview occurred on February 11, 2015.[32]

Immigration Services issued its notice of intent to deny Mr. Anarfi's petition on Ms. Quansah's behalf containing detailed facts why it believed Ms. Quansah's first marriage to Mr. Toomer a "fraudulent or sham marriage" because they "entered into a marriage for the sole purpose of circumventing the immigration laws of the United States."[33] Under § 204(c) of the Act, Immigration Services is prohibited from approving a Form I-130 for a spouse where there is a previous finding the spouse entered into a marriage to evade United States' immigration laws.[34]

4

Immigration Services gave Mr. Anarfi thirty days to rebut its finding Ms. Quansah entered into a fraudulent marriage with Mr. Toomer to evade immigration laws. Mr. Anarfi argued Ms. Quansah and Mr. Toomer had a *bona fide* marriage based on the record but did acknowledge "[o]f all the red flags" for marriage fraud, the presence of Mr. Oppong, a man now convicted for involvement with marriage fraud, "to be sure the most troubling."[35] Ms. Quansah also swore her marriage to Mr. Toomer as brief but loving and bona fide.[36] Ms. Quansah included a two year lease she and Mr. Toomer signed on December 1, 2015 for the address in Woodbridge, Virginia where Mr. Toomer resided.[37] Ms. Quansah and Mr. Toomer never shared a bank account or assets.

Ms. Quansah also included declarations from three friends attesting to the *bona fide* nature of her marriage to Mr. Toomer. Martha Deloach, Ms. Quansah's roommate at Northern Kentucky, swears she met Mr. Toomer when he visited Ms. Quansah in September 2005 and at some point when she visited him and Ms. Quansah in Virginia.[38] Ms. Deloch believed "their relationship was like that from a love story" and believed they were "truly in love."[39] Akeen Atekoja, a classmate of Ms. Quansah at Northern Kentucky, witnessed them together once on Mr. Toomer's visit and they "seemed genuinely happy and devoted to each other…"[40] Another classmate, Fatimatu Baba, had Mr. Toomer and Ms. Quansah during his visit and spoke with him on the phone.[41] She believed they were truly in love and "had no deviant reasons for the marriage."[42]

Immigration Services reviewed Ms. Quansah and Mr. Anarfi's submission and on June 5, 2015, denied Mr. Anarfi's Form I-130 petition.[43] Immigration Services found "substantial and probative evidence" Ms. Quansah engaged in marriage fraud in marrying Mr. Toomer.[44] It then reviewed Ms. Quansah's evidence adduced to overcome the substantial and probative evidence

5

of marriage fraud, and found her evidence not credible.[45] Ms. Quansah's affidavit recounted three in-person meetings between her and Mr. Toomer before their marriage and she did not submit any documents or evidence supporting her statement.[46] Immigration Services also could not authenticate the lease signed by Ms. Quansah and Mr. Toomer because there is no address or phone number listed for the landlord and Ms. Quansah submitted no supporting evidence they actually lived in the home together during the duration of the lease.[47] It found no evidence Ms. Quansah and Mr. Toomer ever lived together or consummated their marriage.[48]

Immigration Services also found Ms. Quansah's explanation of Mr. Oppong's presence at her wedding (being Mr. Toomer's good friend) not credible. ICE detectives observed her arrive at the courthouse alone, and then leave her wedding with Mr. Oppong, instead of her new husband. Further, Mr. Oppong, the only person to attend their wedding, was convicted of involvement in marriage fraud to evade immigration laws.[49] Immigration Services also found the supporting letters from Ms. Deloach, Mr. Atekoja, and Ms. Baba lacked detail and their description of a "loving and committed relationship are not consistent with the story provided by [Ms. Quansah] regarding Mr. Toomer's sudden and unexplained change of his behavior after the wedding ceremony."[50] Immigration Services found Ms. Quansah "did not present any credible evidence" of a bona fide marriage to Mr. Toomer and there is "substantial and probative evidence" to support the finding of a fraudulent marriage, including two previous administrative investigations in her marriage, by ICE and Immigration Services, with the "clear" conclusion of marriage fraud.[51]

## D.     The Board of Immigration Appeals affirms denial of Mr. Anarfi's petition.

Mr. Anarfi and Ms. Quansah appealed Immigration Services's denial to the Board of Immigration Appeals.[52] The Board of Immigration Appeals reviewed the evidence *de novo* and

6

affirmed Immigration Services' denial of Mr. Anarfi's petition.[53] The Board affirmed Immigration Services' finding Ms. Quansah and Mr. Toomer's marriage to be fraudulent as supported by six factors common to the large scale fraudulent wedding ring of Ghana citizens (1) Ms. Quansah is Ghanaian; (2) the marriage took place in Arlington, Virginia; (3) her Form I-130 visa was processed through the Washington, D.C. office; (4) the medical certification and marriage license were issued less than two days apart; (5) the physician who completed her medical certification was named as part of the fraudulent marriage ring; and, (6) Ms. Quansah's Form I-485 "contained the particular language 'MARRIED TO A CITIZEN.'"[54] The Board noted two additional factors supporting a fraudulent marriage beyond Immigration Services' six indicators (1) Ms. Quansah and Mr. Toomer left their wedding separately; and, (2) Ms. Quansah left the wedding with Mr. Oppong, a man later convicted of involvement with the marriage fraud ring the Immigration Services suspected Ms. Quansah's wedding a part of.[55]

The Board then found Ms. Quansah did not adduce "persuasive evidence" to overcome the finding of marriage fraud because she only submitted one piece of contemporary documentary evidence, the lease.[56] The Board did not find the lease persuasive because, having been signed on December 2005, it pre-dated both their engagement and marriage and because it lacked the landlord's identifying information for authentication.[57] The Board disregarded counsel's letter regarding the marriage because counsel had no first-hand knowledge and found the three supporting letters "contain minimal details concerning [Ms. Quansah's] alleged dating relationship and marriage with [Mr. Toomer], and appear inconsistent with [Ms. Quansah's] statement about the disintegration of her prior marriage only a few months after the marriage ceremony."[58]

7

On appeal, Ms. Quansah also raised the argument her marriage to Mr. Toomer never existed because of his marriage two days before to another woman. Ms. Quansah argued because her earlier marriage is bigamous, it is void *ab initio* and she falls outside §204(c).[59] In a footnote, the Board addressed her argument and found § 204(c) applied to Ms. Quansah even if her marriage is void because § 204(c) applies also to persons who "*attempted*…to enter into a marriage" and the evidence supported a finding Ms. Quansah attempted to marry Mr. Toomer.[60]

## II. Analysis

Ms. Quansah and Mr. Anarfi ("Ms. Quansah") now sue asking us to find the Board's findings arbitrary and capricious under the Administrative Procedures Act because the agency relied on "vague 'fraud indicators,'" not actual evidence, in finding Ms. Quansah committed marriage fraud in violation of its own precedent. Ms. Quansah also asks us to find the Board's findings arbitrary and capricious under the Administrative Procedures Act because the Board "selectively use[d] the record" and did not properly consider evidence Ms. Quansah's marriage to Mr. Toomer was bigamous making it void *ab initio* and outside § 204(c).[61] Ms. Quansah also argues the United States violated Mr. Anarfi's Fifth Amendment right to marry the spouse of his choosing and her and Mr. Anarfi's Fifth Amendment due process right.

The United States moves for summary judgment on Ms. Quansah's complaint arguing the Board's decision is supported by evidence and Mr. Anarfi does not have a substantive Fifth Amendment right for his immigrant wife to remain in the United States and Ms. Quansah's due process rights were not violated because she had notice and an opportunity to respond. We agree with the United States and enter summary judgment in its favor.

## A.    Ms. Quansah's claims fail under the Administrative Procedures Act.

Ms. Quansah seeks review of the Board's decision under the Administrative Procedures Act. When we review an agency's decision under the Act, we "sit[] as a an appellate tribunal and the usual summary judgment standard does not apply."[62] The Board already served as factfinder so we are excused from our duty to determine if there are genuine disputes of material fact.[63]

Under the Act, we "may only hold unlawful and set aside agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise accordance with the law.'"[64] "This is a 'deferential standard' that 'presume[s] the validity of agency action.'"[65] We are limited to the administrative record before the Board and in our "narrow" review, we cannot "substitute [our] judgment" for the Board's judgment."[66] We do not "re-weigh the evidence presented but must determine only if "a reasonable mind might accept [the evidence] as adequate to support a conclusion."[67]

### 1.    The Board's finding of substantial and probative evidence of marriage fraud is not arbitrary or capricious.

Ms. Quansah argues the Board's finding of marriage fraud is arbitrary and capricious because there is no "actual evidence" linking Ms. Quansah to marriage fraud, only "vague 'fraud indicators.'" Ms. Quansah argues this Board finding violates the Board's precedent in *Matter of Tawfik*.[68] In *Tawlik*, the Board held a determination under 8 U.S.C. § 1154(c) "an alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws" requires support by "substantial and probative" evidence.[69] Ms. Quansah bears the burden of establishing her marriage to Mr. Toomer was bona fide.[70]

The Board's finding Ms. Quansah entered into a fraudulent marriage with Mr. Toomer is supported by "substantial and probative" evidence. Ignoring for a moment the evidence of the

9

actual marriage fraud ring, Ms. Quansah does not adduce evidence to support a bona fide marriage. Marriage fraud can also be found in the absence of evidence of a bona fide marriage, for example, the marriage is never consummated, and where the spouses never lived together or held themselves out to family and friends as husband and wife.[71]

Ms. Quansah swore her relationship with Mr. Toomer lasted 20 months with only four personal meetings.[72] In her affidavit, she does not allege they saw each other in person after the week they spent together after the marriage on March 23, 2006. Ms. Quansah does not swear they consummated their marriage and agrees they left their marriage ceremony separately. Ms. Quansah only offered a single document to support her argument, a December 1, 2005 lease for a home in Virginia and does not swear she signed this lease during her December 2005 trip to visit Mr. Toomer in Virginia.[73] The Board also found the lease not credible because it lacked information about the landlord, preventing Immigration Services from authenticating the document. The Board also reasonably concluded letters attesting to marriage from Ms. Quansah's friends lacked details and their positive report of the marriage is at odds with Ms. Quansah's own affidavit attesting things deteriorated less than five months into the marriage.

The Board also reasonably found her marriage matched six indicators of a fraudulent marriage ring investigation which resulted in at least federal conviction. Immigration Services and the Board had "substantial and probative" evidence because the investigation into the fraudulent marriage ring was ongoing at the time of Ms. Quansah's wedding and ICE detective observing her leave her wedding with Mr. Oppong.[74] Ms. Quansah does not dispute all six indicators are present, or the presence of Mr. Oppong at her wedding as the only witness. Instead she argues this evidence is not enough to demonstrate she "was part of any potential

conspiracy to commit marriage fraud that the other individuals noted by the [United States] throughout this process may have been involved in."[75]

Ms. Quansah argues under *Tawfik* "the Board of Immigration Appeals made plain that there must "actual and direct evidence" to support a finding of marriage fraud.[76] Ms. Quansah's argument misstates the standard from *Tawfik*, where the Board required "substantial and probative" evidence, not actual or direct evidence.[77] The Board never uses the words "actual" or "direct" in *Tawfik* nor does it hold only direct, and not circumstantial evidence, can support a finding of marriage fraud. Her argument would require the Board ignore the "inference" given from the dearth of evidence of bona fide marriage combined with evidence of fraud indicators, in particular here, the only person to witness her marriage was *at the time* under investigation (later convicted) for involvement with a fraudulent marriage ring between U.S. citizens and Ghanaians (like Ms. Quansah) because there is no sworn statement from anyone admitting to marriage fraud. Under *Tawlik*, the Board does not need sworn statements or confessions to find marriage fraud, it needs "substantial and probative" evidence.

We reviewed the substantial and probative evidence Ms. Quansah attempted to marry Mr. Toomer "for the purpose of evading the immigration laws." We grant the United States' motion for summary judgment because the Board's denial is supported by the administrative record and reasonable minds "accept [the evidence] as adequate to support a conclusion."[78]

## 2. The Board's finding of Ms. Quansah's bigamous marriage does not alter our conclusion.

Ms. Quansah argues the Board's determination is arbitrary and capricious because it failed to meaningfully consider the fact, unknown to her, her marriage to Mr. Toomer was bigamous and void *ab initio* and because it never existed and "cannot legally form the basis for a valid 8 U.S.C. § 1154(c) determination."[79]

11

The Board addressed whether Ms. Quansah's bigamous marriage being void *ab initio* precluded the application of Section 1154(c) prohibiting the approval of citizenship where, "the Attorney General has determined that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws."[80] The Board found § 1154(c) applied to Ms. Quansah's previous marriage even if is void as bigamous because Congress specifically included aliens who attempt to enter into a fraudulent marriage and Ms. Quansah attempted to marry Mr. Toomer.[81]

In *Ferrante v. Immigration and Naturalization Service*, a native and citizen of Italy, Mr. Ferrante, married a United States citizen for the purpose of evading the immigration laws.[82] The United States citizen, however, was already in a common law marriage with another United States citizen when Mr. Ferrante married her.[83] The INS found Mr. Ferrante's marriage fraudulent and ordered him deported.[84] Mr. Ferrante argued he could not have committed fraud because his marriage was void *ab initio* based on his wife's prior common law marriage.[85] The Court of Appeals for the Sixth Circuit affirmed the Board's rejecting his argument because Mr. Ferrante married her for the purpose of evading the immigration laws so "[i]t makes little difference then whether the marriage turned out to be a legal one, valid in law, or an invalid one, unenforceable because the wife has a husband living."[86]

Ms. Quansah, like Mr. Ferrante, attempted to marry a United States citizen to evade the immigration laws and her attempt to enter into the marriage is what matters under § 1154(c). We agree with the reasoning in *Ferrante*, as "it makes little difference" then whether her marriage to Mr. Toomer is void *ab initio* because of his bigamy.

Ms. Quansah requests we follow the Board's precedents regarding void marriages in *Matter of Agustin* and *Matter of G--*. In *Matter of Agustin*, a native and citizen of Philippines

12

stated she was the unmarried child of a U.S. citizen on her immigrant visa application and the United States granted her a visa.[87] The United States began deportation proceedings against Ms. Agustin and introduced into evidence her Filipino marriage certification from before she filed her immigrant visa application listing herself as single.[88] Ms. Agustin argued her marriage was not valid under Filipino law because she did not freely consent to the marriage, the Philippines did not issue a valid marriage license, and the marriage was not "properly solemnized."[89] The Board disagreed and found the evidence showed Ms. Agustin's marriage valid but remanded the case for a determination whether Ms. Agustin had fraudulent intent when she represented herself as single on her via application.[90]

In *Matter of G--*, a U.S. citizen married a Greece native and citizen and represented they were 18 and 21 years old respectively on their marriage license.[91] In fact, the U.S. citizen was 16 and her "husband" was 19 years old when the married and thus under the Illinois legal age to consent to marriage.[92] Under Illinois law, a marriage entered into before the age of consent is "binding and valid until disaffirmed or until annulled by judicial decree..."[93] The Board found evidence the couple "appeared to be getting along well" and wife's mother withdraw her petition to annul the marriage and approved the husband's petition for citizenship because on their "valid, bona fide, presently-existing marriage."[94]

We do not find persuasive guidance from these cases. Neither *Matter of Agustin* and *Matter of G—*implicate § 204(c) or § 1154(c) nor include a determination as to the effect of an earlier void marriage has on the Board's finding an alien attempted to enter into a marriage to evade the immigration laws. Whether Ms. Quansah's marriage to Mr. Toomer turned out to be valid or void makes no difference on the finding she <u>attempted</u> to marry him to evade the immigration laws. The Board's holding Ms. Quansah attempted to marry him to evade the

13

immigration laws is supported by the record and law and whether Ms. Quansah's marriage to Mr. Toomer turned out to be valid or void makes no difference to the Board's finding under § 1154(c). We grant summary judgment for the United States because the Board's holding is reasonable, supported by the record, and not arbitrary or capricious.

### B. Mr. Anarfi's claims under the Fifth Amendment also fail.

Mr. Anarfi argues the Board impermissibly interfered with his substantive Fifth Amendment liberty interest to be married to and live with the spouse of his choosing and violated his and Ms. Quansah's right to procedural due process under the Fifth Amendment.

### 1. Mr. Anfari's substantive due process claims fail.

To prove the Board violated his substantive due process right, Mr. Anarfi must show the Board denied a constitutionally protected interest "by arbitrary or capricious" action.[95] While Mr. Anarfi does have a fundamental protected interest to marry the spouse of his choice,[96] he cites no case law holding he has a fundamental right for his spouse to remain in the United States when the Board found she committed marriage fraud under § 1154(c).[97]

### 2. Mr. Anarfi and Ms. Quansah procedural due process claims fail.

Mr. Anarfi and Ms. Quansah also argue the Board's denial of his Form I-130 and finding of marriage fraud violates his Fifth Amendment due process rights.[98] In the context of immigration adjudications, due process requires Mr. Anarfi and Ms. Quansah "(1) entitled to 'factfinding based on a record produced before the decisionmaker and disclosed to' [them]; (2) must be allowed to make arguments on [their] own behalf; and, (3) has the right to 'an individualized determination of [their] interests."[99] "To prevail on a procedural due process challenge to a decision by the [Board], [Mr. Anarfi and Ms. Quansah] must make an initial showing of substantial prejudice."[100]

14

Mr. Anarfi and Ms. Quansah do not dispute Immigration Services provided due process under the second and third prongs. Mr. Anarfi and Ms. Quansah instead argue Immigration Services violated the first element of due process by failing to disclose the record produced before the decision maker. Mr. Anarfi and Ms. Quansah seem to argue Immigration Services violated due process by failing to make Mr. Anarfi or Ms. Quansah aware of the allegation of marriage fraud "until eight years after" and failing to disclose the record "in a meaningful manner" because it did not disclose the actual underlying documents but only a hearsay summary.[101]

Mr. Anarfi's first argument about the eight year delay lacks merit. Ms. Quansah failed to appear for her June 2012 interview for the Form I-130 petition filed by Mr. Toomer on her behalf. Mr. Anarfi does not cite authority for the proposition Immigration Services has an affirmative duty to inform an alien of its investigation into possible marriage fraud where the alien and her husband failed to show up for their interviews and pursue their petition.

Mr. Anarfi and Ms. Quansah's second argument is Immigration Services failed to "meaningfully disclose" evidence against Ms. Quansah because they only provided the actual "Summary of Findings" after denying their petition.[102] They argue the facts in Immigration Services' Notice of Intent to Deny only provide "summaries" of this document "without disclosure of its many flaws."[103] Mr. Anarfi and Ms. Quansah do not identify specific factual misrepresentations between the Notice of Intent to Deny facts and the "Summary of Findings" facts, instead, they argue the "Summary of Findings" is based on "hearsay" and "concedes" only six out of the possible nineteen fraud indicators are present in Ms. Quansah's case.[104]

We closely reviewed the facts in Immigration Services' Notice of Intent to Deny Mr. Anfari's petition issued April 18, 2015 and the facts in the "Summary of Findings" disclosed

after the denial.[105] We cannot locate, and Mr. Anarfi and Ms. Quansah do not specify, incorrect or misrepresented facts used in "Summary of Findings" but not disclosed in the Notice to Deny. We also cannot locate additional facts in the "Summary of Findings" and relied on by the Board not disclosed by Immigration Services in its Notice of Intent to Deny to find a due process violation. Even if Immigration Services had a duty to disclose the "Summary of Findings" with the Notice of Intent to Deny, Mr. Anarfi and Ms. Quansah do not show "substantial prejudice" from the late disclosure because they were aware of the relevant facts against Ms. Quansah. They do not dispute the accuracy of the facts or point to facts relied on of which they were not aware; rather, they dispute the inference Immigration Services and the Board took from those facts which is not a due process violation.

Mr. Anarfi and Ms. Quansah argue Immigration Services had a constitutional duty to allow them to "inspect" the "Summary of Findings" before denying the petition under *Sehgal v. Lynch.*[106] In *Sehgal*, a U.S. citizen wife, petitioned for permanent resident status for her husband.[107] Immigration Services denied her petition on the finding the husband previously entered into a fraudulent marriage to evade immigration laws.[108] Immigration Services based its finding of marriage fraud, among other evidence, a statement from his former wife admitting to marriage fraud.[109] The husband objected to the former wife's statement as hearsay and alleged Immigration Services violated its procedures by failing to disclose a copy of statement in the administrative proceedings, instead it only providing a summary of full text.[110]

The court of appeals rejected the first objection because, "[h]earsay is admissible in immigration proceedings as long as it is probative and its use is not fundamentally unfair."[111] The court also found Immigration Services properly disclosed the evidence to the husband because of summary of the statement, rather than the statement itself "can suffice" for proper

16

procedure.[112]   The court found no violation in spite of the fact Immigration Services' mischaracterization of the former wife's statement as sworn in the administrative proceedings would have been discovered had Immigration Services produced the document before the case reached the federal district court.[113]  While the court of appeals "stressed" "the better procedure' is for agencies to 'procedure the statement in question,'" it found a verbatim summary of the statement satisfied procedural requirements.[114]

Mr. Anarfi and Ms. Quansah do not allege Immigration Services mischaracterized or omitted evidence from its summation of the "Summary of Findings" unlike *Seghal* where Immigration Services' mischaracterization of the statement as sworn may have affected the weight accorded in the administrative proceedings.  At best they argue the "Summary of Findings" contains hearsay, which under *Seghal* is admissible because it is relevant and not fundamentally unfair.  Immigration Services met its regulatory and constitutional requirements by providing an accurate and fulsome summation of the "Summary of Facts" in its Notice of Intent to Deny.  Mr. Anarfi and Ms. Quansah were able to fully respond to those facts before Immigration Services denied the petition and again before the Board (after disclosure of the actual "Summary of Facts" document) and cannot show any, let alone substantial, prejudice from Immigration Services' post-denial disclosure of this document.

## III.   Conclusion

We grant the United States' motion for summary judgment on Ms. Quansah's claim the Board's decision is arbitrary or capricious because the record evidence supports the reasonableness of its decision.  We also grant the United States' motion for summary judgment on Mr. Anarfi's and Ms. Quansah's Fifth Amendment claims because they do not adduce evidence of a violation of substantive constitutional or procedural due process right.

[1] Certified Administrative Record, p. 66 (hereinafter "A066").

[2] A087.

[3] A066.

[4] *Id.*

[5] A067.

[6] A068.

[7] A069.

[8] A134.

[9] A068, 072. Ms. Quansah swears they were married on March 21, 2006 but the marriage certificate is dated March 23, 2006. *See* A334.

[10] A068-69.

[11] A069.

[12] A087.

[13] A134.

[14] A070.

[15] A071.

[16] A143.

[17] A089.

[18] A088.

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] A088, A037.

[24] A088.

[25] A089.

[26] A035.

[27] A135.

[28] A147.

[29] A131.

[30] A135.

[31] A157-A285.

[32] A286, A135.

[33] A135.

[34] A131.

[35] A106.

[36] A066-A072.

[37] A073.

[38] A079.

[39] A079.

[40] A081.

[41] A083.

[42] *Id.*

[43] A031.

[44] A038.

[45] *Id.*

[46] The decision cites four in-person meetings including the date of their engagement, February 14, 2006. Ms. Quansah's affidavit, however, states Mr. Toomer proposed over the telephone which would mean she had three in-person visits.

[47] A036.

[48] A038.

[49] A037.

[50] *Id.*

[51] A038.

[52] A009.

[53] A004.

[54] A005.

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] A014.

[60] A006.

[61] Complaint, ECF Doc. No. ¶¶, 31, 33.

[62] *Singh v. Holder*, No. 17-7063, 2015 WL 7888711 at *2 (E.D. Pa. Dec. 3, 2015) (citing *Uddin v. Mayorkas*, 862 F. Supp. 2d 391, 399 (E.D. Pa. 2012)).

[63] *Id.* (citing *Byrne v. Beers*, No. 13-6953, 2014 WL 2742800 at *3 (E.D. Pa. June 17, 2014) and *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 770 (9th Cir. 1985)).

[64] *Id.* (quoting 5 U.S.C. § 706(2)(A)).

[65] *Id.* (quoting *SBS Inc. v. F.C.C.*, 414 F.3d 486, 496 (3d Cir. 2005) and *Southwestern Bell Tel. Co. v. F.C.C.*, 168 F.3d 1344, 1352 (D.C. Cir. 1999)).

[66] *Id.* (quoting *NVE, Inc. v. Dep't of Health & Human Servs.*, 436 F.3d 182, 190 (3d Cir. 2006) and *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

[67] *Smith v. Holder*, 487 Fed. Appx. 731, 733 (3d Cir. 2012)

[68] *Matter of Tawfik*, 20 I. & N. Dec. 166 (BIA 1990).

[69] *Smith v. Holder*, 10-5321, 2011 WL 131877014 at *2 (E.D. Pa. June 13, 2011) (*affirmed Smith*, 487 Fed. Appx. 731 (3d Cir. 2012) (quoting 8 U.S.C. § 1154(c) and *Tawlik*, 20 I. & N. Dec. at 167); *see also Eid v. Thompson*, 740 F.3d 118, 124 (3d Cir. 2014) (a determination of a fraudulent marriage under § 1154(c), "requires 'substantial and probative' evidence of an attempt to receive immigration benefits based on a false marriage").

[70] *See Smith*, 487 Fed. Appx. at 733-34 ("In this case, Immigration Services could have reasonably concluded that Smith had not met her burden of establishing a legally valid marriage.").

[71] *See Matter of Phillis,* 15 I. & N. Dec. 385 (BIA 1975).

[72] A066-072.

[73] A067.

[74] A134.

[75] ECF Doc. No. 1 at 8.

[76] ECF Doc. No. 7-1 at 6.

[77] *See Tawfik*, 20 I. & N. Dec. at 167.

[78] *Smith*, 487 Fed. Appx. at 733.

[79] ECF Doc. No. 1, ¶ 10.

[80] 8 U.S.C. § 1154(c).

[81] A006.

[82] *Ferrante v. Immigration and Naturalization Service*, 399 F.2d 98, 100 (6th Cir. 1986).

[83] *Id.*

[84] *Id.* at 103.

[85] *Id.*

[86] *Id.* at 104.

[87] *Matter of Agustin*, 17 I. & N. Dec. 14, 14-15 (BIA 1979).

[88] *Id.* at 15.

[89] *Id.*

[90] *Id.* at 17.

[91] *Matter of G--*, 9 I. & N. Dec. 89, 89 (BIA 1960).

[92] *Id.* at 90.

[93] *Id.* at 91.

[94] *Id.*

[95] *Iredia v. Fitzgerld*, No. 10-228, 2010 WL 2994215 at *5 (E.D. Pa. July 27, 2010) (citing *Sameric Corp. of Del. v. City of Philadelphia*, 142 F.3d 582, 590 (3d Cir. 1998)).

[96] *See Obergefell v. Hodges*, --- U.S. ---, 135 S.Ct. 2584, 2604-05 (2015).

[97] *See Bakran v. Johnson*, 192 F. Supp. 3d 585, 596 (E.D. Pa. 2016) (quoting *Fasano v. United States*, 230 Fed. Appx. 239, 240 (3d Cir. 2007)) (Our court of appeals observed "[t] Constitution 'does not recognize the right of a citizen spouse to have his or her alien spouse remain in the country.'").

[98] ECF Doc. No. 1, ¶ 38.

[99] *Abdulai v. Ashcroft*, 239 F.3d 542, 549 (3d Cir. 2001) (quoting *Llana-Castellon v. INS*, 16 F.3d 1093, 1096 (10th Cir. 1994) and citing *Rhoa-Zamora v. INS*, 971 F.2d 26, 34 (7th Cir. 1992)).

[100] *Estela-Gomez v. Attorney General of U.S.*, 629 Fed. Appx. 432, 436 (3d Cir. 2015) (quoting *Bonhometre v. Gonzales*, 414 F.3d 442, 448 (3d Cir. 2005)).

[101] ECF Doc. No. 1, ¶ 41; ECF Doc. No. 7-1 at 13.

[102] *See* A0288-0291.

[103] ECF Doc. No. 7-1 at 14.

[104] *Id.* at 13.

[105] *Cf.* A097-A102 and A0288-0291.

[106] 813 F.3d 1025 (7th Cir. 2016).

[107] *Id.* at 1027.

[108] *Id.* at 1028.

[109] *Id.* at 1029.

[110] *Id.* at 1029-1031.

[111] *Id.* at 1029 (citing *Ogbolumani v. Napolitano*, 557 F.3d 729, 733-34 (7th Cir. 2009) and *Olowo v. Ashcroft*, 368 F.3d 692, 699 (7th Cir. 2004)).

[112] *Id.* at 1031-32.

[113] *Id.*

[114] *Id.*